IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KARA DANIEL, Assignee of H&F Bros.,    *
LLC and Northland Insurance Company

                                     *

      Plaintiff

                                     *

v.

                                     *     CASE NO.:  1:13-CV-01519-MJG

NATIONAL CASUALTY INSURANCE
COMPANY, et al.                         *

      Defendants                    *

        *     *     *     *     *

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
### SECOND CROSS-MOTION FOR SUMMARY JUDGMENT, OR IN THE
### ALTERNATIVE PARTIAL SUMMARY JUDGMENT

Now comes the Plaintiff, Kara Daniel, Assignee of R&H Trucking, Inc. ("R&H"), Aaron

Hines, Derrick Hines, H&F Bros., LLC, ("H&F"),[1] BDH Trucking, Inc., and Northland

Insurance Company ("Northland") by and through her attorneys, Stephen A. Markey, III, Amy

M. Orsi, and the Law Offices of Stephen A. Markey, III, P.C., and in support of Plaintiff's

Motion for Summary Judgment, or in the Alternative for Partial Summary Judgment and says:

### INTRODUCTION & SUMMARY OF ARGUMENT

Plaintiff is moving for entry of summary judgment in her favor and against Defendant

National Casualty because based upon the undisputed facts the National Casualty policy was in

effect on October 26, 2007. This is so for two reasons. First, the attempted cancellation of the

---

[1] H&F Brothers, LLC, is the successor corporation to BDH Trucking, Inc. According to Dennis Hotchkiss, the owner of H&F Bros., LLC in the underlying lawsuit, BDH Trucking, Inc.'s assets were merged into H&F Bros., LLC prior to the occurrence.

National Casualty policy was invalid under North Carolina law.  Second, National Casualty's

cancellation of its policy for non-payment was ineffective because it was an interstate policy

governed by the Federal Motor Carrier Safety Regulations that was not properly canceled in

accordance with those regulations.  Finally, National Casualty's insurance policy was the

primary liability insurance policy covering the occurrence.  Consequently, Plaintiff is entitled to

entry of judgment that the National Casualty liability policy was in effect on October 26, 2007

and that it was the primary policy of liability insurance covering the occurrence. Alternatively,

Plaintiff is entitled to the entry of partial summary judgment that National Casualty's attempted

cancellation of the policy was ineffective, and that the policy was in effect on the date of the

occurrence.

## **UNDISPUTED FACTS**

On October 26, 2007, Eric Daniel was involved in a motor vehicle collision with a

Freightliner tractor pulling a Ryder trailer leased to H&F, being driven by Derrick Hines. (ECF

Doc. No. 22, p. 3). The tractor had a placard on the side indicating that R&H and Derrick  Hines,

were leased on with H&F Bros., LLC out of Wisconsin.  (ECF Doc. No.54-11, p. 2).  As a result

of the accident, Kara Daniel, individually and on behalf of the Estate of Eric Daniel, filed suit

against Aaron Hines, Derrick Hines, R & H Trucking, Inc. (R&H"), BDH Trucking, Inc.

("BDH") and H&F Bros. LLC ("H&F"), among other Defendants.  (ECF Doc. No. 22; See JKB-

10-2757).  H&F was the successor company to BDH and at the time of the accident, and was

insured by Northland Insurance Company ("Northland") with a one million dollar liability limit

(ECF Doc. No. 22, p. 3).

Prior to the occurrence, on August 9, 2007 Aaron Hines, on behalf of R&H, applied for and received a "Commercial Auto Multistate" insurance policy from National Casualty. (ECF Doc. No. 10-8, p. 12). The policy itself contemplates that it insures covered autos in interstate operations. Section II (A)(2)(b) specifically provides that "[w]hile a covered auto is away from the state where it is licensed…" the limits of liability and other coverages will be increased "to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered auto is being used." (ECF Doc. No. 10-8, p. 23). R&H agreed to pay a monthly premium of $347.97 per month, and made an initial up-front payment of $963.00 (more than two months' premium) and financed the balance of the premium through Prime Rate Premium Finance Corporation, Inc. ("Prime Rate") (ECF Doc. No.30-5). Prime Rate thereafter paid the balance of the premium. (ECF Doc. No. 30-6).

On September 13, 2007 Prime Rate alleges it mailed a "10 Day Notice of Intent to Cancel" to R&H for failure to make the required loan payments. (ECF Doc. Nos. 30-4 & 30-5, p.2). Aaron Hines and R&H never received the September 13, 2007 notice until sometime after September 25, 2007. (ECF Doc. No. 34-6, p. 2, ¶8.; ECF Doc. No. 30-7, p.2.).

National Casualty refused to defend R&H, Aaron Hines or Derrick Hines in the lawsuit brought by Kara Daniel. (ECF Doc. No. 54-6, pp. 2-9). The sole reason National Casualty gave for denying coverage was that the policy had been "canceled for non-payment of premium." Id. (See also, ECF Doc. No. 55-6, pp. 2 & 5).

Defendant has not disputed that the National Casualty policy was intended to cover Derrick Hines, Aaron Hines, R&H Trucking, Inc., the Freightliner tractor and any trailer being

pulled by the Freightliner, so long as the policy was not canceled. (ECF Doc. No. 30-1, pp. 1, 2, 5 & 20)(See also ECF Doc. No. 10-8, p. 20).  There is no dispute that under the National Casualty policy the Freightliner tractor and trailer were defined as covered "autos."  (ECF Doc. No. 10-8, pp. 2, 5 & 20).

National Casualty has presented no evidence that Prime Rate sent the "10 Day Notice of Intent to Cancel to the Rhonda Moreen Insurance Agency as required by N.C.G.S.A. §58-35-85(1).  The undisputed evidence on the issue is that R&H and Aaron Hines denied receiving the 10 Day Notice of Intent to Cancel (ECF Doc. No. 34-6, p. 2) and that the alleged notice does not list the Rhonda Moreen Insurance Agency as a recipient of a copy of the notice. (ECF Doc. 36-2, p. 2).  As will be explained herein, National Casualty bears the burden of proving that it complied with the statutory requirements.

National Casualty's sole reason given for denial of coverage was non-payment of premium. (ECF Doc. No. 54-6, pp. 2 & 5).  There is not any dispute that R&H paid the first two months premium and Prime Rate Premium Finance Corporation, Inc. paid the balance of the premium. (ECF Doc. No.30-5, p. 2; 34-6, p. 2).The alleged reason for the 10 Day Notice of Intent to Cancel is the alleged failure to pay Prime Rate loan installments. (ECF Doc. No. 30-6, p. 2).

As long as the Northland policy covered Derrick Hines, Aaron Hines, R&H Trucking, Inc., the Freightliner tractor or the trailer being pulled by the Freightliner tractor at the time of the accident, Northland policy and National Casualty policy insured the same interests.  At all relevant times, the Ryder trailer was a named insured under the Northland policy (ECF Doc. No.

47-3 p. 86, 90-91).  The Northland policy specifically includes the MCS-90 endorsement. (ECF

Doc. No.47-3 p. 16). The policy includes the MCS-90 on its Schedule of Forms and

Endorsements stating that "endorsements are contained in this policy at its inception." (ECF

Doc. No.47-3 p. 5).  The MCS-90 is signed by the same authorized representative, James E.

Joyce, Jr., for Northland as the rest of the policy.  (ECF Doc. No.47-3 p. 16). The MCS-90 is

incorporated as part of the Northland policy language, and states "the insurer (the company)

agrees to pay, within the limits of liability described herein, any final judgment recovered against

the insured for public liability resulting from negligence in the operation, maintenance or use of

motor vehicles….regardless of whether or not each motor vehicle is specifically described in the

policy…." (ECF Doc. No.47-3 p. 16).

The Northland policy specifically identifies "Covered Autos" in the SCHEDULES OF

COVERAGES AND COVERED AUTOS section to include autos defined by symbols "67, 68,

71" as follows:

> Symbol 68- Hired "Autos" Only:  Only those "autos" you lease, hire, rent or
> borrow.
>
> Symbol 71- Nonowned "Autos" Only: Only those "autos'" you do not own, lease,
> rent or borrow that are used in connection with your business. This includes
> "private passenger type" "autos" owned by your "employees" or partners (if you
> are a partnership), members (if you are a limited liability company), or members
> of their households but only while used in your business or your personal affairs.

(ECF Doc. No.47-3 p. 16).

The Freightliner Tractor involved in the occurrence was a covered auto within the definition of

the Northland policy.  H&F conceded in the matter of *Daniel, et al. v. H & F, et al*. that "[a]t all

times relevant to this lawsuit, Derrick Hines and R and H Trucking, Inc. were operating under the authority of H&F Brothers, LLC. (ECF Doc Nos. 54-5, p. 3; 54-6, pp. 2-4; 54-7, p. 7).  Once leased on to H&F, the vehicle being driven by Derrick Hines fell within the definition of "Covered Autos" (Symbol 68).  (ECF Doc. No. 54-6). Northland Insurance Company defended R&H Trucking, Inc. and the Hines' because they had leased on with H&F Bros., LLC (ECF Doc. No. 54-6).  Additionally, attorney Kevin Soper was paid $23,661.00 in attorneys' fees and $678.18 in expenses by Northland Insurance Company for providing legal services to Aaron Hines, Derrick Hines and R&H.  (ECF Doc No. 34-6, p. 2 & No. 54-6, p. 4).

On or about August 9, 2007, R&H Trucking, Inc. submitted an application for insurance to National Casualty that was prepared by Rhonda Moreen of Rhonda Moreen Insurance Agency (ECF Doc. No. 47-1 p. 3).  Aaron Hines advised Ms. Moreen that R&H Trucking, Inc. "drove for other companies only and although we were currently hauling lumber we wanted to be able to handle other goods and products."  (ECF Doc No. 34-6, p. 1).  He further advised Ms. Moreen that his company "currently hauled lumber but wanted to be able to haul different kinds of goods for other companies." Id.  Mr. Hines explained that although R & H Trucking, Inc. was currently driving only in North Carolina, he did not tell her that in the future that they would only drive in North Carolina. Id. Aaron Hines never told Ms. Moreen that he wished to purchase a policy that covered intrastate trucking only (ECF Doc. No. 34-6 p. 1).  Mr. Hines believed he was applying for and had received "a multi-state trucking policy" to allow R & H Trucking, Inc. and himself to drive for other companies. Id.

Prior to the occurrence, the National Casualty was aware that R&H Trucking, Inc. was driving on behalf of H&F Brothers LLC, an interstate trucking company with its principal office in Wisconsin. (ECF Doc. No. 34-6 p. 3).  When the occurrence took place, the vehicle operated by R&H Trucking, Inc. displayed a sign reading "H&F Bros., LLC" and was marked with H&F Bros., LLC's US Department of Transportation number on the side of the truck (ECF Doc. No. 34-7 p. 3).  Northland Insurance Company insured H&F Bros., LLC and pursuant to the Federal Motor Carrier Safety Regulations, also insured any vehicle leased on with H&F Bros., LLC, including R&H Trucking, Inc. and Derrick Hines, its driver.  (See FMCSR §387.313, ECF Doc. No. 47-3 p. 33).  National Casualty has not disputed that if the policy in question was an interstate policy, either by design or by any of the theories raised by the Plaintiff, that the policy was not properly canceled pursuant to § 387.7(b)(1) of the Federal Motor Carrier Safety Regulations.  National Casualty's failure to strictly comply with § 387.7(b)(1) of the Federal Motor Carrier Safety Regulations is the same as having provided no notice of cancellation at all.

Plaintiff settled her claims in the underlying wrongful death lawsuit with R&H Trucking, Inc., Derrick Hines, and Aaron Hines, with the payment being made by Northland Insurance Company.  (ECF Doc. No. 30-3).  Northland Insurance Company, R&H Trucking, Inc., Derrick Hines, Aaron Hines, BDH Trucking, Inc. and H&F Bros., LLC entered into a Joint Tortfeasor Release with the Plaintiff by settling all claims against them for $1,000,000.00 and granted Kara Daniel an assignment of any claims that any of the released parties or Northland Insurance Company may have had against National Casualty for indemnification or contribution.  Id.

The only issue that needs to be resolved, assuming that the National Casualty policy was still in place, is whether the Northland policy also covered the 1997 Freightliner tractor, the trailer it was pulling, R & H Trucking, Inc., Derrick Hines or Aaron Hines.

At all times relevant, the Ryder trailer was a named insured under the Northland policy (ECF Doc. No. 47-3 p. 86, 90-9).  At all relevant times, the Northland policy was governed under an MCS 90 Endorsement (ECF Doc. No. 47-3 p. 33).  Pursuant to the MCS 90 Endorsement, any vehicle being driven on behalf of H&F Bros., LLC, thereby triggering the MCS 90 Endorsement, was a covered vehicle "regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." Id.

## SUMMARY JUDGMENT STANDARD

A Court may enter Summary Judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catredt, 477 U.S. 317, 322 (1996).  Summary Judgment is inappropriate if the Court finds that any material fact "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F. 3d 459 (4th Cir. 2001).  "A mere scintilla of proof… [is not enough] to prevent summary judgment." Peters v. Jenney, 327 F.3d 307,314 (4th Cir. 2003).  The Supreme has held that the evidence offered in objection to the Motion for Summary Judgment must be "significantly probative" for the Motion to be denied.  Liberty Lobby, 477 U.S. 249-50 (citations omitted).  However, the Court must construe the facts that are presented and any reasonable

inferences in the light most favorable in the non-moving party.  *See*, <u>Scott v. Harris,</u> 550 U.S. 372, 378 (2007); <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776,783 (4th Cir. 1999) (citation omitted).

## <u>ARGUMENT</u>

**I.      The policy was in effect on the date of the occurrence because National Casualty cannot prove that it complied with North Carolina's statutory prerequisites for cancellation.**

North Carolina has a detailed statutory procedure governing cancellation of insurance policies for nonpayment when a premium finance company is involved.  N.C.G.S.A. §58-35-85. Section "58-35-85 controls the cancellation of an insurance policy by an insurance premium finance company."  <u>Universal Ins. Co. v. Patterson,</u> 210 N.C. App. 241, 246, 708 S.E.2d 129, 133 (2011).  The statute provides, in pertinent part:

> When an insurance premium finance agreement contains a power of attorney or other authority enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be canceled unless the cancellation is effectuated in accordance with the following provisions:
>
> (1) Not less than 10 days' written notice is sent by personal delivery, first-class mail, electronic mail, or facsimile transmission to the last known address of the insured or insureds shown on the insurance premium finance agreement of the intent of the insurance premium finance company to cancel his or their insurance contract or contracts unless the defaulted installment payment is received. Notification thereof shall also be provided to the insurance agent.
>
> (2) After expiration of the 10-day period, the insurance premium finance company shall send the insurer a request for cancellation and shall send notice of the requested cancellation to the insured by personal delivery, first-class mail,

electronic mail, electronic transmission, or facsimile transmission at his last known address as shown on the records of the insurance premium finance company and to the agent. Upon written request of the insurance company, the premium finance company shall furnish a copy of the power of attorney to the insurance company. The written request shall be sent by mail, personal delivery, electronic mail, or facsimile transmission.

(3) Upon receipt of a copy of the request for cancellation notice by the insurer, the insurance contract shall be canceled with the same force and effect as if the request for cancellation had been submitted by the insured, without requiring the return of the insurance contract or contracts.

N.C.G.S.A. §58-35-85.  Paragraph 4 mandates that the insurance contract may not be canceled by the insurer unless all of the restrictions mandated by the statute are followed:

(4) All statutory, regulatory, and contractual restrictions providing that the insurer may not cancel the insurance contract unless the insurer first satisfies the restrictions by giving a prescribed notice to a governmental agency, the insurance carrier, an individual, or a person designated to receive the notice for said governmental agency, insurance carrier, or individual shall apply where cancellation is effected under the provisions of this section.

Id.

Importantly, "the burden of proving compliance with N.C. Stat. § 58-35-85 is on the insurance company." Universal Ins. Co. v. Patterson, 210 N.C. App. 241, 245, 708 S.E.2d 129, 132 (2011).  "Furthermore, the burden of proving cancellation by the insured or his agent is on the insurance company." Id.  "In order to cancel a policy the carrier must comply with the procedural requirements of the statute or the attempt at cancellation fails **and the policy will continue in effect despite the insured's failure to pay in full the required premium**." Id.; Cahoon v. Canal Ins. Co., 140 N.C. App. 577, 580, 537 S.E.2d 538, 540 (2000)(emphasis

added); <u>GEICO v. New South Ins. Co.</u>, 119 N.C.App. 700, 702-03 (1995); <u>Paris v. Woolard,</u> 128 N.C. App. 416, 420, 497 S.E.2d 283, 286 (1998)("In order to cancel a policy the carrier must comply with the procedural requirements of the statute or the attempt at cancellation fails and the policy will continue in effect despite the insured's failure to pay in full the required premium"); <u>Grant v. State Farm Mutual Automobile Ins. Co.</u>, 1 N.C.App. 80, 159S.E.2d 368, 371 (1968)("the burden is upon the insurance company to show that all statutory requirements have been complied with, **including the ten day written notice by the premium finance company to the insured together with said notice to the insurance agent**, prior to the premium finance company requesting cancellation of the policy")(emphasis added).

It is undisputed that Prime Rate failed to satisfy the restrictions contained in Paragraph 1 of the statute. First, it failed to provide the insureds' with 10 days written notice of its intent to cancel the insurance contract. (ECF Doc. No. 34-6, p. 2, ¶8.; ECF Doc. No. 30-7, P.2.). Aaron Hines and R&H never received the required 10 day notice. <u>Id.</u> Additionally, the face of the purported 10 day notice itself shows that the agent, Rhonda Moreen of Rhonda Moreen Insurance Agency was not provided a copy of the notice as the statute requires, because the notice contains no indication that she was provided a copy. (ECF Doc. No. 36-2, p. 2). It is instructive to compare the defective 10 day notice dated September 13, 2007 to the final Notice of Cancellation dated September 25, 2007, which clearly indicates on its face that a copy was provided to Ms. Moreen. (ECF Doc. No. 36-2, p. 2). The absence of such a notation on the September 13, 2007 initial notice is compelling (and undisputed) evidence that Ms. Moreen was never provided a copy of the original 10 day notice as required by the statute.

The only evidence National Casualty has to offer on this issue are two Affidavits.  The first is the Affidavit of Frances L. Townsend which states that "[f]or North Carolina agents, it is Prime Rate Premium Finance Corporation, Inc.'s normal course of business to send to the listed agent for each affected insurance policy a list of accounts for which 10 Day Notices of Intent to Cancel have been sent."  (ECF Doc. No. 36-1, ¶4.).  This affidavit is plainly insufficient to prevent the entry of summary judgment because the affiant lacks personal knowledge as to whether the normal course of business was followed in this instance, whether the notice was sent, how the notice was sent, who sent the notice, what the notice contained, whether a copy of the actual notice allegedly sent to R&H was sent, and whether the 10 Day Notice of Intent to Cancel was sent to and/or received by the listed agent, Ms. Moreen.  Although Mr. Townsend claims the notice attached to his affidavit was mailed to R&H, he does not state how he has personal knowledge that it was mailed, who mailed it, or how it was mailed (i.e. regular mail, certified mail, Priority Mail, etc.).

The second Affidavit is that of Matthew Rosinski, a senior underwriter at National Casualty Company. (ECF Doc. No. 30-4).  An underwriter for National Casualty in Scottsdale, Arizona cannot establish proof of mailing of the 10 Day Notice of Intention to Cancel (required for the cancellation to be effective), allegedly sent by a separate entity, Prime Rate Premium Finance Corporation, Inc. of Charlotte, North Carolina, unless he has personal knowledge, physically placed the notice in the mailbox or delivered it to the post office. Luizzi v. Pro Transport, Inc., 548 F.Supp.2d 1, 8 (E.D.N.Y 2008). It is impossible for Mr. Rosinski to have had personal knowledge of the facts recited in his Affidavit regarding the purported acts of Prime

Rate that he did not witness.  Prime Rate Premium Finance Corporation, Inc. was not disclosed

by the Defendant as an affiliated entity of the Defendant in its Rule 103.3 disclosure statement

(ECF Doc. No. 15) and therefore it is assumed the two are separate entities with no financial

relationship.  Next, the Rosinski Affidavit does not even mention the mailing of the notice to the

insurance agent, Rhonda Moreen Insurance Agency or Rhonda Moreen as required by North

Carolina law.  N.C.G.S.A. § 58-35-85 (a)(1).  Even the Notice of Cancellation was not properly

sent to the insurance agent, as it incorrectly lists "Moreen Insurance Agency" instead of the

"Rhonda Moreen Insurance Agency" or "Rhonda Moreen" as agent for R&H. (ECF Doc. No.

30-7, p 2; <u>See also</u>, ECF Doc. No. 10-7, p. 1).

 The North Carolina legislature took its statutory premium finance cancellation procedure

seriously enough that it enacted a provision declaring that any person "who shall fail to observe

the rules and regulations made by the Commissioner pursuant to this Article shall be deemed

guilty of a Class I misdemeanor."  N.C.G.S.A. §58-35-90.

 Section 58-35-85 states that "the insurance contract or contracts shall not be canceled

unless the cancellation is effected in accordance with [the provisions of the statute]."

Accordingly, the insurance contract was never canceled and will remain effective under North

Carolina law until 10 days' written notice is provided to both the insured(s) and the insurance

agent as is mandated by Paragraph 1 of the statute.  Plaintiff is therefore entitled to entry of

partial summary judgment that the National Casualty policy was in effect on the date of the

occurrence by virtue of Prime Rate's failure to adhere to N.C.G.S.A. §58-35-85, since furnishing

a proper 10 day notice to the insured(s) and the insurance agent is a condition precedent for the cancellation process to proceed.

When a policy is canceled mid-term, as is the situation here, strict compliance with the statute is a necessity.  Otherwise, the policy will remain in effect until the policy is scheduled to expire.  Pearson v. Nationwide Mut. Ins. Co., 325 N.C. 246, 382 S.E.2d 745 (1989).  In Pearson, the Plaintiff was a passenger in a vehicle, owned by Barbara Harrington, while being operated by Charles Harrington, Barbara's Harrington husband, during which Mr. Harrington caused an accident wherein Mr. Pearson was injured on September 20, 1981.  Id. at 249.  As a result, Mr. Pearson obtained a judgment against Mr. and Mrs. Harrington which Nationwide, the Harrington's carrier refused to pay as it claimed the policy was canceled prior to the accident due to non-payment.  Id.

On April 17, 1981, Nationwide issued an automobile liability policy to Mrs. Harrington for the policy period from April 17, 1981 to October 17, 1981 which would remain in effect so long as the installment payments for the required premium were timely paid.  Id.  On June 8, 1981, Nationwide mailed Mrs. Harrington a premium notice which stated that an installment payment of $39.39 for the policy was due on June 28, 1981.  On July 6, 1981, having failed to receive the payment due on June 28, 1981, Nationwide mailed to Mrs. Harrington a "Notice of Cancellation for Non Payment of Premium" and stated the policy would terminate on the 20th day after the due date.  Id.  However, the cancellation notice failed to provide a fifteen –day period between the date the notice was mailed and the cancellation date and therefore, did not confirm with the provisions of N.C.Gen.Stat. §20-310(f)(2) which states in part that an insurer's

notice of cancellation of automobile insurance must state the date on which the cancellation is to become effective.  The statute further requires that, when cancellation is for nonpayment of premiums, the date so stated must be at least fifteen (15) days from the date the insurer mails or deliver the notice.  Id. at 250-51.

Nationwide's cancellation notice failed to comply with N.C.Gen.Stat. §20-310(f)(2) for failure to state the date upon which the cancellation is to be effective.  Id. at 251-52.  The Court rejected Nationwide's argument that the accident occurred long after the fifteen days needed for notice and over two months after the failure to pay the required premiums.  Therefore, since cancellation was not proper and in accordance with the statute, the Court found that Mrs. Harrington's policy continued to remain in effect on September 20, 1981, the date of the accident and that Nationwide was liable to pay the judgment entered in favor of Mr. Pearson and against Mr. and Mrs. Harrington.

In accordance with Pearson, as a result of Prime Rate's failure to adhere to N.C.G.S.A. §58-35-85, the National Casualty policy continued to remain in effect on the date of the accident involving Mr. Hines and Mr. Daniel.

In addition, National Casualty's sole reason given for denial of coverage was non-payment of Premium. (ECF Doc. No.54-6 p. 2, 5). Pursuant to N.C.G.S.A.§58-63-15(11)(n), National Casualty must "promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim…."  National Casualty could not have canceled for non-payment of premium because the premium had been paid in full by Prime Rate which is why R&H Trucking owed a loan to Prime Rate.  The 10 Day Notice of

Intent to Cancel, allegedly mailed by Prime Rate to R&H Trucking (but not to R&H Trucking's agent or received by R&H Trucking in violation of North Carolina Law), states that for "failure to make payment of the [loan] amount due under your premium finance (service) agreement [to Prime Rate Premium Finance Corporation, Inc.], it intends to "request and effect cancellation of… [the National Casualty] insurance policy(ies) pursuant to the power of attorney signed by you." (ECF Doc. No. 36-2, p. 2).  The National Casualty policy was issued in North Carolina and it allegedly canceled the policy based on N.C.G.S.A §58-35-85 for non-payment of installment payments to Prime Rate.  Therefore it is clear that National Casualty did not cancel based on nonpayment of premium to National Casualty. If not canceled for the failure to pay premium, the policy provides for 30 days notice before cancellation. National Casualty was required to mail or deliver to R&H Trucking notice 30 days before it attempted to cancel.  (ECF Doc. No. 10-8, p. 40).  Furthermore, R&H Trucking paid two (2) months premium in advance.  (ECF Doc. No. 34-6, p. 2).

Even assuming that failure to pay the loan payment to Prime Rate was the same as not paying premiums to National Casualty (even though two (2) months of premium were paid), in addition to complying with FMCSR and North Carolina law, National Casualty still owed a separate contractual duty to provide 15 days written notice to R&H Trucking before it could cancel its policy.  (ECF Doc. No. 10-8, p. 40).

Therefore, under the National Casualty policy the Defendant owed a separate contractual duty to provide R&H Trucking its own written notice before it could cancel the policy (ECF Doc. No. 55-1, pp. 8-9).  Although it can be disputed as to whether the Defendant was required

to give fifteen (15) days written notice of intent to cancel (if canceling for non-payment of premium) versus thirty (30) days (if cancellation deemed to fall under endorsement CA 01 26 03 01 (North Carolina Changes) Section F.1.a of the policy (See ECF Doc. No. 10-8, p. 40), there is no material dispute of fact that National Casualty did not give any notice of its intent to cancel, and the only notice allegedly ever given was by Prime Rate Premium Financing Corporation, Inc.

**II.     The policy was in effect on the date of the occurrence because National Casualty issued an interstate trucking policy and failed to comply with the cancellation provisions in 49 C.F.R. 387.7(b)(1).**

The undisputed facts of this case make it clear that the vehicle involved in the occurrence was involved in interstate commerce, and that National Casualty issued an interstate trucking policy. North Carolina law incorporates the definitions of "Interstate Commerce" and "Interstate Motor Carrier" as set forth in federal regulations:

> (3) Interstate commerce.- As defined in 49 C.F.R. Part 390.5.
>
> (3a) Interstate motor carrier.- Any person, firm or corporation that operates or controls a commercial motor vehicle as defined in 49 C.F.R. Part 390.5 in interstate commerce.

N.C.G.S.A. §20-376 (3) & (3a). Those terms are defined in 49 C.F.R. Part 390.5 as follows:

> *Commercial motor vehicle* means any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle—
>
> (1) Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater; or

17

(2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or

(3) Is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

(4) Is used in transporting material found by the Secretary of Transportation to be hazardous under 49 U.S.C. 5103 and transported in a quantity requiring placarding under regulations prescribed by the Secretary under 49 CFR, subtitle B, chapter I, subchapter C.

*****

*Interstate commerce* means trade, traffic, or transportation in the United States—

(1) Between a place in a State and a place outside of such State (including a place outside of the United States);

(2) Between two places in a State through another State or a place outside of the United States; or

(3) Between two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States.

49 C.F.R. §390.5.

### A.    R&H Trucking's vehicle was participating in interstate commerce.

There is no doubt that the vehicle involved in the occurrence was involved in interstate commerce.  First, in the underlying wrongful death litigation, H&F Bros., LLC admitted that "H&F Bros. was the carrier for the load being hauled by Derrick Hines and R&H Trucking from Accurate Recycling in Landsdowne, PA to recycle America in Raleigh, NC on October 26, 2007." (ECF Doc. No. 54-7, p 6).  This is further supported by the deposition testimony of Dennis Hotchkiss of H&F Bros., LLC in the underlying litigation, where he testified under oath that on the trip on which the occurrence took place Derrick Hines was hauling a H&F Bros., LLC trailer from North Carolina to Pennsylvania and back. (ECF Doc. No. 54-8, p. 24).  The

truck displayed a placard indicating that it "was driven on behalf of H&F Bros., LLC of

Wisconsin." (ECF Doc. No. 54-11, p. 2). The Load Confirmation for the trip showed that it was

brokered by KTI, Inc., of Minnesota, and that H&F Bros., LLC was to arrange transport of a load

of "PLASTICS" from Pennsylvania to North Carolina. (ECF Doc. No. 54-12, p. 17).  Similarly,

the Straight Bill of Lading for the trip confirms that the occurrence took place on an interstate

trip.  (ECF Doc. No. 54-12, p. 20). The undisputed facts show that the vehicle involved in the

occurrence was a commercial motor vehicle that was involved in interstate commerce.

> **B.    National Casualty Company issued a Multistate Commercial Auto Policy to R&H Trucking, Inc.**

An examination of the undisputed facts additionally shows that the policy National

Casualty issued to R&H Trucking, Inc. covered interstate operations. First, the policy's Schedule

of Covered Autos You Own indicates that the insured vehicle would be operated within a 300

mile radius of Ayden, North Carolina.  (ECF Doc. No. 10-8, p. 9).  That 300 mile radius of

operations covers North Carolina, South Carolina, Virginia, West Virginia, Maryland, Delaware

and the District of Columbia.  (ECF Doc. No. 34-12, p. 1).

Second, the provisions contained within the National Casualty policy itself indicate that it

is a multistate policy.  For example, it contains a provision entitled "2006 Commercial Auto

Multistate Forms Revision Advisory Notice to Policyholders."  (ECF Doc. No. 10-8, p. 12).  The

same part of the policy contains a section entitled "MULTISTATE ENDORSEMENTS" and

contains a "Broadened Coverage- Garages" endorsement providing that the Coverage Territory

for personal injury and advertising injury sustained by electronic means to include "worldwide

coverage." (ECF Doc. No. 10-8, p. 14). The policy also contains a coverage extension providing for an increase in coverage limits to match the amount of required minimum coverage in the event of a loss occurring "[w]hile a covered 'auto' is away from the state where it is licensed…." (ECF Doc. No. 10-8, p. 23). Moreover, the policy contains a specific provision governing the policy period and coverage territory:

**7. Policy Period, Coverage Territory**

Under this Coverage Form, we cover "accidents" and "losses" occurring:
a. During the policy period shown in the declarations; and
b. Within the coverage territory.

The coverage territory is:
a. The United States of America;
b. The territories and possessions of the United States of America;
c. Puerto Rico;
d. Canada; and
e. Anywhere in the world if:
  (1) a covered 'auto' of the 'private passenger' type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and
  (2) The 'insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico, or Canada or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving a covered "auto" while being transported between any of these places.

(ECF Doc. No. 10-8, p. 30). Additionally, the Affidavit of Aaron Hines, owner of R&H Trucking, Inc. states that "[p]rior to the accident [he] had applied for and received a multi-state trucking policy from National Casualty Insurance Company." (ECF Doc. No. 34-6, p. 1). The foregoing arguments and undisputed facts clearly show that the National Casualty policy was an interstate policy.

**C.      The National Casualty policy was a primary policy.**

R&H Trucking, Inc. is a named insured under National Casualty's policy. (ECF Doc. No.

10-8, p. 1).  The 1997 Freightliner Tractor involved in the occurrence was an insured vehicle

under the policy.  (ECF Doc. No. 10-8, pp. 1, 2).  Additionally, the Ryder trailer attached to the

Freightliner at the time of the occurrence is an insured auto because the 1997 Freightliner is

governed by Symbol 46- Specifically Described Autos, even though non-owned because it was

attached to the 1997 Freightliner.  (ECF Doc. No. 10-8, p. 20).  Derrick Hines is an "insured"

under the policy because he was a permissive user of a covered auto owned by R&H.  (ECF Doc.

No. 10-8, p. 22).  Derrick Hines is an insured because he was "liable for the conduct of an

"insured…." Id.  The National Casualty policy is a primary policy because by its terms, R&H

Trucking, Inc., Aaron Hines and Derrick Hines are "insureds" and because the 1997 Freightliner

and the attached Ryder trailer were "Covered Autos."

**D.      National Casualty failed to properly cancel the policy issued to R&H as
         required by 49 C.F.R §387.7(b)(1).**

No motor carrier is permitted to "operate a motor vehicle until the motor carrier has

obtained and has in effect the minimum levels of financial responsibility" required by under the

applicable federal regulation.  49 C.F.R. §387.7(a).

> Proof of the required financial responsibility shall be maintained at the motor
> carrier's principal place of business. The proof shall consist of—
>
> (1) "Endorsement(s) for Motor Carrier Policies of Insurance for Public Liability
> Under Sections 29 and 30 of the Motor Carrier Act of 1980" (Form MCS-90)
> issued by an insurer(s)….

49 C.F.R. §387.7(d).  There are specific procedures to be followed when that financial security is to be canceled:

> (b)(1) Policies of insurance, surety bonds, and endorsements required under this section shall remain in effect continuously until terminated. Cancellation may be effected by the insurer or the insured motor carrier giving 35 days' notice in writing to the other. The 35 days' notice shall commence to run from the date the notice is mailed. Proof of mailing shall be sufficient proof of notice.

49 C.F.R §387.7(b)(1).  Federal regulations also require that notice be provided in a very specific way:

> (d) Cancellation notice. Except as provided in paragraph (e) of this section, surety bonds, certificates of insurance and other securities or agreements shall not be canceled or withdrawn until 30 days after written notice has been submitted to the FMCSA at its offices in Washington, DC, on the prescribed form (Form BMC-35, Notice of Cancellation Motor Carrier Policies of Insurance under 49 U.S.C. 13906, and BMC-36, Notice of Cancellation Motor Carrier and Broker Surety Bonds, as appropriate) by the insurance company, surety or sureties, motor carrier, broker or other party thereto, as the case may be, which period of thirty (30) days shall commence to run from the date such notice on the prescribed form is actually received by the FMCSA.

49 C.F.R §387.313(d).  It is particularly telling that National Casualty has offered no evidence that it provided written notice to the FMCSA in the prescribed format, no evidence that written notice was received by the FMCSA, and no evidence that it waited 30 days after the required notice was received by the FMCSA before cancelling the policy.  Since National Casualty failed to follow the prescribed procedures for termination, the policy "shall remain in effect continuously…."  49 C.F.R. §387.7(b)(1).  Therefore the policy was in effect on October 26, 2007, and remained in effect until the termination date set forth in the policy.  Pearson v. Nationwide Mut. Ins. Co., 325 N.C. 246, 259, 382 S.E.2d 745, 751-52 (1989).  In this case, that would be August 9, 2008.  (ECF Doc. No. 10-8, p. 3)(policy period from 8/9/2007 to 8/9/2008).

**III.    Any cancellation provisions contained in the National Casualty policy are ineffective and irrelevant because they are superseded by statute.**

National Casualty cannot argue that it has any right to cancel the policy based upon any cancellation provisions contained within the policy itself.  As the Court of Appeals of North Carolina has explained:

> First, an insurance policy is a contract, and is to be construed and enforced in accordance with its terms insofar as they are not in conflict with pertinent statutes and court decisions.  As to the effect of any statute on an insurance policy, the law is clear that a statutory requirement or limitation is to be read into the policy as if written therein and controls a contrary provision actually written into the policy

Universal Ins. Co. v. Patterson, 210 N.C.App. 241, 246, 708 S.E.2d 129, 132 (2011). The appellate court went on to hold that:

> Accordingly, we do not need to address the cancellation language in the insurance policy because §58-35-85 controls the procedure for the cancellation of an insurance policy by an insurance premium finance company.

Id. at 133, 708 S.E.2d at 246.

<u>**CONCLUSION**</u>

For the reasons stated herein, Plaintiff respectfully requests that the Court grant summary judgment in her favor and enter an Order declaring that the National Casualty policy was in effect on the date of the occurrence, and that it was a primary liability policy with respect to the occurrence.  Alternatively, the Plaintiff requests the Court find the National Casualty policy was not canceled on the date of the occurrence and allow the parties to conduct discovery limited to determining whether the policy was primary or co-primary with the Northland Insurance policy.

Respectfully submitted,


_____/s/_____
STEPHEN A. MARKEY, III
Bar No.:  04458


_____/s/_____
AMY M. ORSI
Bar No.:  27298
Law Offices of Stephen A. Markey, III, P.C.
1426 E. Joppa Road
Towson, Maryland  21286
(410) 583-0755
steve@markeylawfirm.com
amy@markeylawfirm.com
Attorneys for Plaintiff


## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th Day of October, 2014, a copy of the foregoing

Memorandum of Law in Support of Plaintiff's Second Cross- Motion for Summary Judgment, or

in the Alternative Partial Summary judgment was served on all counsel of record via electronic

transmission.


_____/s/_____
AMY M. ORSI
Bar No.:  27298