IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KARA DANIEL                         *

           Plaintiff              *

           vs.                     *     CIVIL ACTION NO. MJG-13-1519

NATIONAL CASUALTY                  *
INSURANCE COMPANY
                                   *
           Defendant
                                   *

*       *       *       *       *       *       *       *       *

MEMORANDUM AND ORDER

    The Court has before it Defendant National Casualty

Company's Renewed Motion for Summary Judgment [ECF No. 62],

Plaintiff's Second Cross-Motion for Summary Judgment or in the

Alternative, Motion for Partial Summary Judgment [ECF No. 63],

and the materials submitted relating thereto.  The Court has

held a hearing and had the benefit of the arguments of counsel.


I.   INTRODUCTION

    On October 26, 2007, the husband of Plaintiff Kara Daniel

("Daniel") was killed in a truck-automobile collision in Queen

Anne's County, Maryland.  Daniel filed suit against the driver

and others in this Court, seeking $10,000,000 in damages.

Daniel v. Hotchkiss Trucking, Inc., No. 10-cv-2757-JKB (D. Md.).

    The situation regarding insurance coverage for the

defendants was complicated.  Northland Insurance Company

("Northland") acknowledged that it had issued a $1,000,000 commercial trucking liability insurance policy that insured certain of the defendants and tendered its policy limits. National Casualty Insurance Company ("National Casualty") had issued a $750,000 policy to some of the defendants but claimed that the policy was not in effect at the time of the accident and refused to provide a defense or coverage for any defendant.

Daniel settled the underlying case, receiving the $1,000,000 policy limits of the Northland policy and also an assignment of any rights that Northland and any defendant she released may have had against National Casualty. Northland paid the settlement "on behalf of" these defendants. As part of the settlement, Northland and the settling defendants assigned to Daniel:

> all of [their] rights, title and interest that [they] may have, whether in tort or contract for indemnification and/or contribution, for damages arising out of the accident that occurred on October 26, 2007 which is the subject of said lawsuit, including all claims against National Casualty Insurance Company [for] any failure on the part of National Casualty Insurance Company to defend or indemnify Derrick Hines, Aaron Hines, R&H Trucking, H&F Bros LLC, and/or BDH Trucking, Inc. in said Lawsuit.

[ECF No. 1-3].

On May 23, 2013, Daniel, as the assignee of Northland and others, filed the instant lawsuit against National Casualty for indemnification.  Daniel filed an Amended Complaint on July 26, 2013 as the assignee of Northland, BDH, and three others — Aaron Hines, Derrick Hines and R&H Trucking, Inc. — who are collectively referred to herein as the Driver Group members. [ECF No. 22].

National Casualty filed a Motion to Dismiss.  [ECF No. 30]. After a hearing on November 27, 2013, the Court dismissed the Amended Complaint.  The Court stated at the hearing: "There is nothing in the [Amended] complaint that shows any basis to believe that any assignor of rights, other than Northland, was out of pocket or had any loss, or anything that they could claim against National Casualty."  Hr'g Tr., Nov. 27, 2013, [ECF No. 47-2] at 3.  The Court allowed Daniel to file a Second Amended Complaint ("SAC") and instructed Daniel that she should explain "whatever the relationship is . . . that puts National Casualty on the hook to pay indemnity or some kind of contribution."  Id.

Daniel filed the SAC on January 3, 2014, alleging claims, as assignee, against National Casualty in two Counts:

- Count I — Indemnification for $1,000,000
- Count II — Contribution for $650,000

See [ECF No. 46].

National Casualty filed a Motion to Dismiss, or in the

3

Alternative, Motion for Summary Judgment, [ECF No. 47], and

Daniel filed a Cross-Motion for Partial Summary Judgment. [ECF

No. 55].

In the Memorandum and Order issued September 29, 2014, [ECF

No. 61] at 4-6, the Court stated:

> The Court finds the parties' respective briefings inadequate. Both sides have submitted voluminous briefings that "incorporate by reference as if fully stated herein," all arguments made in previous filings . . . .
>
> Moreover, while Daniel contends that she is entitled to partial summary judgment, she does not specify which issue or issues on which she seeks summary judgment and those on which she does not.
>
> Under the circumstances, the Court will deny the pending motions without prejudice and provide an opportunity for the parties to file new motions for summary judgment. However, the Court will require the parties, should they refile motions for summary judgment, to comply with the following:
>
> . . . .
>
> • The parties shall address . . .:
>
>   o The legal standards applicable to any common law indemnification and contribution claims;
>   o The relationship between R&H and H&F/BDH at the time of the October 26, 2007 accident;
>   o The intrastate or interstate nature of the National Casualty policy, with evidentiary support for their contentions; . . .

- The parties shall clearly explain their
  respective positions as to the effect of
  the Notice of Cancellation that Prime
  Rate mailed to R&H (336A Cottonfield
  Court, Ayden, NC 28513) on 09/13/2007.

National Casualty filed the instant Renewed Motion for
Summary Judgment, [ECF No. 62], and Daniel filed the instant
Second Cross-Motion for Summary Judgment or in the Alternative,
Motion for Partial Summary Judgment. [ECF No. 63].

II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the
pleadings and supporting documents "show[] that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).

The well-established principles pertinent to summary
judgment motions can be distilled to a simple statement: The
Court may look at the evidence presented in regard to a motion
for summary judgment through the non-movant's rose-colored
glasses, but must view it realistically. After so doing, the
essential question is whether a reasonable fact finder could
return a verdict for the non-movant or whether the movant would,
at trial, be entitled to judgment as a matter of law. See,
e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).

Thus, in order "[t]o defeat a motion for summary judgment, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).  However, "self-serving, conclusory, and uncorroborated statements are insufficient to create a genuine issue of material fact."  Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt., Inc., 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013); see also Wadley v. Park at Landmark, LP, 264 F. App'x 279, 281 (4th Cir. 2008).

When evaluating a motion for summary judgment, the Court must bear in mind that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).


III. BACKGROUND

   A.   The Underlying Case Defendants

   In October 2007, H&F Bros., LLC, ("H&F"), a Wisconsin commercial trucking company, was hired to transport a shipment of goods from Landsdowne, Pennsylvania to Raleigh, North

6

Carolina.  Memorandum of Points and Authorities in Support of Hotchkiss Trucking, Inc.s (sic) Motion for Summary Judgment at 5, Daniel v. Hotchkiss Trucking, Inc., No. 10-cv-02757-JKB (D. Md.) [ECF No. 106-1].  H&F subcontracted the assignment to R&H Trucking, Inc. ("R&H"), a North Carolina company owned by Aaron Hines ("Aaron").

R&H obtained the truck involved in the accident, a 1997 Freightliner tractor – truck, power unit, or cab – as lessee from Basic Trucking, Inc., ("Basic Trucking").  Second Amended Complaint ("SAC") [ECF No. 46] at ¶ 15.  The truck was subleased by R&H to H&F. SAC ¶ 11.  A Ryder cargo trailer was attached to the tractor that "was leased and provided by Hotchkiss Trucking, Inc., [("Hotchkiss")] to H&F . . . and R&H."  SAC ¶ 11.

At the time of the accident, the truck with trailer was driven by Derrick Hines, an employee of R&H.  The driver's side door of the truck was labelled "R&H, Inc. Trucking" and contained the North Carolina address and telephone number of R&H.  There also was a placard on the truck that stated "Lease to H&F Bros, LLC" and contained H&F's motor carrier and Department of Transportation numbers.  [ECF No. 55-10] at 10.

B. The Insurance

H&F obtained, and had in effect on the date of the accident, a commercial trucking liability insurance policy through Northland Insurance Company ("Northland") with a

combined single limit liability in the amount of $1,000,000.
[ECF No. 47-3] at 4.  H&F required R&H to have commercial
trucking liability insurance.  R&H obtained a policy through
National Casualty Insurance Company ("National Casualty") with a
combined single limit liability in the amount of $750,000. [ECF
No. 10-8] at 2.  However, as discussed herein, the policy was
not in effect on the date of the accident.


IV. DISCUSSION

       As discussed herein, the Court grants summary judgment to
National Casualty on the following grounds:

       A.    Plaintiff cannot prove that Northland sustained any
             loss by virtue of any action or inaction by National
             Casualty.

       B.    Plaintiff cannot prove that the National Casualty
             policy was in effect at the time of the accident and,
             even if it were in effect:

             1.    Plaintiff cannot prove that the Driver Group
                   members were "insureds" under the Northland
                   policy.

             2.    Plaintiff cannot prove the requisite relationship
                   between the National Casualty and Northland
                   policies to establish the National Casualty
                   policy as providing excess coverage.


       A.   No Loss Sustained by National Casualty

       In the underlying suit, Plaintiff sued for $10,000,000.  Of
course, that amount is not, in itself indicative of what a
plaintiff would accept to settle a case.  However, Daniel

8

consistently proceeded on the basis of a claim against Defendants for a multi-million recovery.  There is no evidence that she ever offered to settle her claim for less than a multi-million dollar recovery.  Nor is there any contemporaneous evidence that she actually contemplated accepting anything less than at least $2,000,000 to resolve her claim.

In the Memorandum in Support of Plaintiff's Opposition to Motion for (sic) to Dismiss or in the Alterantive (sic) Motion Summary Judgment, filed October 7, 2013 [ECF No. 34-1], at 9 n.5, Plaintiff, seeking to establish that her claim was in excess of the $1,750,000 combined policy limits of the Northland and National Casualty policies, stated: "[e]ven if both National Casualty and Northland were considered primary policies, Eric Daniel was a 27 year old pharmacist when he died. Future earnings were far in excess of two million dollars."

In proceedings in the instant case on November 27, 2013, the Court stated that the Complaint was dismissed, and an Amended Complaint was permitted and that the Amended Complaint had to present:

> allegations of fact that would establish that had National Casualty been in fact responsible as an insurer, that Northland would have paid less than it paid, which would require in there something to the effect that the case would have settled for something, in an amount so that [Northland] would not have been required to pay its policy limits in any event; and . . . some

9

> kind of facts that the legal fees that
> Northland paid were not for the benefit of
> its own insureds. . . .

Hr'g Tr., Nov. 27, 2013, [ECF No. 47-2] at 3.

On January 3, 2014, Plaintiff filed the Second Amended Complaint [ECF No. 46]. On January 17, 2014, National Casualty filed Defendant National Casualty Company's Motion to Dismiss Second Amended Complaint, or in the Alternative, Motion for Summary Judgment [ECF No. 47-1] asserting, _inter_ _alia_, that Plaintiff had failed to alleged facts establishing that Northland suffered any damages.

On January 17, 2014, National Casualty filed Defendant National Casualty Company's Motion to Dismiss Second Amended Complaint, or in the Alternative, Motion for Summary Judgment [ECF No. 47]. On February 21, 2014, Plaintiff, in response to that contention, filed an affidavit [ECF No. 54-11] stating that she and her husband had uninsured motorist coverage with Erie Insurance Company with a policy limit of $1,250,000. Erie denied coverage. She said that prior to the denial of the claim by Erie she would have accepted $500,000.00 "to avoid the emotional pain of litigating over the death of my husband." She further stated:

> It was my understanding that R&H Trucking,
> Aaron Hines, and Derrick Hines carried a
> $750,000.00 insurance policy with National
> Casualty . . . . I would have accepted the
> policy limits, and in fact would have

accepted considerably less than policy
limits, if offered and I could have avoided
the emotional pain of pursuing the
litigation.
. . . .

Before policy limits were offered, I had
instructed my attorney that if I was
required to have my deposition taken, I
wanted to settle for whatever was offered at
the settlement conference.  Without a doubt,
if the most the Defendants had offered was
$500,000.00, I would have taken it.
. . . .

After I settled with the Northland
Defendants, it was my feeling that Mr.
DeWald, representing Hotchkiss Trucking, was
attacking me, Eric and Eric's parents.  I
got angry and upset so I advised my attorney
that he should not dismiss Hotchkiss
Trucking, Inc. without a fight.

Without a doubt, had it not been for the
conduct of Mr. DeWald, I would have settled
with Hotchkiss Trucking, Inc. for whatever
they offered if they simply had not
attacked me, Eric and Eric's parents.
. . . .

There is absolutely no question that if
National Casualty, on behalf of Derrick
Hines and R&H Trucking, Inc., had made an
offer of policy limits or even considerably
less than policy limits, which I would have
considered to [be] an acceptance of fault by
the Defendants, even though I know that the
Release would have denied the same, I would
have accepted that payment as a full and
final resolution of this matter against all
possible Defendants and put it behind me.

. . . .

There is also no question that had it not
been for the change in counsel at or around
the first Settlement Conference, who took

more of a scorched earth position and
attacked me, Eric, and Eric's family, I
would have settled for with (sic) the policy
limits offer by Northland and the
Defendants, and in fact would have accepted
as low as $500,000.00 to settle the case.

Daniel Aff. [ECF No. 54-11] at ¶¶ 10-25.

As discussed below, Daniel would not prevail even if a
jury were to find this affidavit credible and a court were to
find it sufficient to prove that Northland would have paid
less than its policy limits.  However, the Court finds
Plaintiff's affidavit so grossly incredible on its face that
such testimony could not result in any reasonable jury relying
upon it.

Moreover, it appears that Daniel may not be the only
Plaintiff from whom Daniel would need an affidavit regarding the
acceptance of a settlement less than $1,000,000.  The record in
the underlying case[1] establishes that Daniel filed that lawsuit

---

[1]     The Court takes judicial notice of the record in the
underlying lawsuit.  Daniel v. Hotchkiss Trucking, Inc., No. 10-
cv-2757-JKB (D. Md.).  Cf. Colonial Penn Ins. Co. v. Coil, 887
F.2d 1236, 1239 (4th Cir. 1989) ("We note that '[t]he most
frequent use of judicial notice of ascertainable facts is in
noticing the content of court records.'  21 C. Wright & K.
Graham, Federal Practice and Procedure: Evidence § 5106 at 505
(1977).  In addition, Fed.R.Evid. 201(f) provides that 'judicial
notice may be taken at any stage of the proceeding' of such
matter . . . ." (alteration in original)); Aloe Creme Labs.,
Inc. v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970) ("The
District Court clearly had the right to take notice of its own
files and records and it had no duty to grind the same corn a
second time. Once was sufficient.").

in October 2010, naming only herself as plaintiff.  After the
settlement with Northland, on May 11, 2011, Daniel filed a
motion to file an Amended Complaint to add her deceased
husband's parents as plaintiffs. [ECF No. 53 in 10-cv-2757-JKB].
This amendment, which was permitted by Judge Bredar of this
Court on August 2, 2011, [ECF No. 90 in 10-cv-2757-JKB],
increased the noneconomic damages cap and overall damages
available in the underlying case.  See Md. Code Ann., Cts. &
Jud. Proc. § 11-108(b)(3)(ii) ("In a wrongful death action in
which there are two or more claimants or beneficiaries, an award
for noneconomic damages may not exceed 150% of the limitation
established under paragraph (2) of this subsection . . . .").

In June 2011, counsel for H&F informed Judge Bredar that
Northland had tendered its policy limits of $1,000,000 as a
result of informal settlement discussions during which Daniel
"demanded policy limits." [ECF No. 63 in 10-cv-2757-JKB].  The
$1,000,000 from Northland was not enough for Daniel. She and the
additional plaintiffs pursued litigation against Hotchkiss – the
entity that leased the Ryder trailer to R&H and H&F – ultimately
obtaining a $250,000 settlement payment from Sentry Insurance,
the insurance carrier for Hotchkiss.[2]  Daniel Aff. [ECF No. 55-1]
at ¶¶ 17, 22.

---

[2]  Daniel dismissed the case against Basic Trucking – the
entity that had leased the 1997 Freightliner to R&H – without

The Court concludes that Plaintiff has not presented evidence adequate to permit a reasonable jury to find that, had National Casualty accepted coverage of its insureds, Northland would have paid less than its policy limits to settle the case against its insureds H&F and BDH.[3]

---

settlement in November 2011.  See [ECF No. 101 in JKB 10-2757].

[3]    The Court notes that "Northland paid a total of $23,661.00 in attorney fees and $678.18 in expenses" to counsel for the Driver Group members in the underlying lawsuit.  Soper Aff. [ECF No. 54-6] at ¶ 10.  However, National Casualty had no duty to defend the case.

As the Court of Special Appeals of Maryland has stated:

> The right of one insurer to recover from another insurer costs incurred in defending an action that the other insurer was obligated to defend was recognized in the case of Ryder & Whitehouse, 259 Md. 354, 269 A. 2d 826 (1970).  In that case, there was a conflict over the "virtually identical 'other insurance' clauses of two automobile liability insurance policies."  . . . [T]he court recognized that one insurance carrier having a duty to defend which denies that duty must reimburse costs and attorney's fees to another carrier that steps in to provide the defense.

Travelers Indem. Co. v. Ins. Co. of N. Am., 519 A.2d 760, 767 (Md. Ct. Spec. App. 1987).

However, Ryder is distinguishable from the instant case:

> The Ryder court noted that the facts presented there were unique and "apt never to recur."  Ryder, 259 Md. at 355, 269 A.2d 826.  Two insurers disputed their relative liabilities arising from an accident involving a tractor-trailer combination. . . . What made Ryder so unusual was that the dispute involved the insurers of two vehicle owners (each of whom owned one component of the tractor-trailer combination), not the

B.   <u>The National Casualty Policy Was Not in Effect</u>

The National Casualty policy went into effect on August 9, 2007.  [ECF 10-8] at 3.  R&H entered into a Premium Service Agreement with Prime Rate Premium Finance Corporation, Inc. ("Prime Rate") to finance the premium on the National Casualty policy.  [ECF 30-5].  The Premium Service Agreement granted Prime Rate a Power of Attorney as "Attorney-In-Fact with full authority to effect cancellation of the policies covered hereby."  <u>Id.</u>

The Driver Group members did not pay their premium installments to Prime Rate, and Prime Rate cancelled the policy. Daniel contends that the cancellation was ineffective on the

---

<u>more usual case of the insurer of the owner and the insurer of a non-owning operator</u>. Both owners' policies provided that their coverage was excess when the accident arose out of the use of a non-owned vehicle.  To invoke its excess clause, the insurer of the tractor's owner asserted that the accident arose from the use of the tractor rather than the maintenance of the trailer; the insurer of the tractor's owner relied on the fact that the accident arose from the use of the trailer to invoke its excess clause. <u>Id.</u> at 361-62, 269 A.2d 826.  Each insurer, thus, claimed that its coverage was excess to the other because the accident arose from the use of a non-owned vehicle within the meaning of the policies.

<u>Universal Underwriters Ins. Co. v. Allstate Ins. Co.</u>, 638 A.2d 1220, 1222-23 (Md. Ct. Spec. App. 1994) (emphasis added).

However, for the reasons discussed hereinafter, National Casualty did not have a duty to defend the Driver Group members in the underlying lawsuit.

grounds that Prime Rate did not comply with North Carolina's procedural requirements in effecting cancellation.

North Carolina General Statutes § 58-35-85 permits a premium finance company to cancel an insurance contract for nonpayment of premium installments:

> When an insurance premium finance agreement contains a power of attorney or other authority enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled unless the cancellation is effectuated in accordance with the following provisions:
>
> (1) Not less than 10 days' written notice is sent by personal delivery, first-class mail, electronic mail, or facsimile transmission to the last known address of the insured or insureds shown on the insurance premium finance agreement of the intent of the insurance premium finance company to cancel his or their insurance contract or contracts unless the defaulted installment payment is received. Notification thereof shall also be provided to the insurance agent.
>
> (2) After expiration of the 10-day period, the insurance premium finance company shall send the insurer a request for cancellation and shall send notice of the requested cancellation to the insured by personal delivery, first-class mail, electronic mail, electronic transmission, or facsimile transmission at his last known address as shown on the records of the insurance premium finance company and to the agent. Upon written request of the insurance company, the premium finance company

> shall furnish a copy of the power of
> attorney to the insurance company. The
> written request shall be sent by mail,
> personal delivery, electronic mail, or
> facsimile transmission.
>
> (3)   Upon receipt of a copy of the request
>       for cancellation notice by the insurer,
>       the insurance contract shall be
>       cancelled with the same force and
>       effect as if the request for
>       cancellation had been submitted by the
>       insured, without requiring the return
>       of the insurance contract or contracts.

N.C. Gen. Stat. Ann. § 58-35-85.  "[T]he burden of proving

compliance with N.C. Gen.Stat. § 58-35-85 is on the insurance

company. . . . 'In order to cancel a policy the carrier must

comply with the procedural requirements of the statute or the

attempt at cancellation fails and the policy will continue in

effect despite the insured's failure to pay in full the required

premium.'"  Cahoon v. Canal Ins. Co., 537 S.E.2d 538, 540 (N.C.

Ct. App. 2000).

On September 13, 2007, Prime Rate mailed a "10 Day Notice

of Intent to Cancel" to R&H.[4]  The notice states that unless

payment is received, Prime Rate will cancel the National

Casualty policy effective September 24, 2007.  [ECF 30-6].

Aaron Hines stated in an Affidavit that he did not receive the

Notice of Cancellation until "sometime after September 25,

2007."  A Hines Aff. [ECF 34-6] at ¶ 9.  However, Prime Rate

---

[4]   North Carolina law does not require proof that the insured
received the notice within the ten-day period.

mailed the notice to the address for R&H listed on the National
Casualty policy.  Moreover, R&H's insurance agent Rhonda Moreen
Insurance Agency (the "Moreen Agency") received a Cancellation
Listing from Prime Rate via facsimile that contains a notation
from a Moreen Agency representative stating "spoke with Mr.
Hines regarding pmt." on September 24 at 11:05 AM. [ECF No. 65-
1].

on September 25, 2007, Prime Rate mailed a "Notice of
Cancellation" to R&H, stating that the National Casualty policy,
had been "cancelled for non-payment of an installment in
accordance with the conditions and terms of the premium finance
agreement." [ECF No. 65-1].  The date of cancellation was
listed as September 25, 2007.  The Notice of Cancellation was
also mailed to the Moreen Agency.  On September 25, 2007,
National Casualty issued Endorsement No. 2 cancelling the R&H
policy effective September 25.  [ECF 30-8].

Daniel contends that the cancellation was ineffective
because the Notice of Intent to Cancel did not comply with the
administrative regulation applicable to § 58-35-85, which states
that "[a] copy of the ten-day notice, or a listing of delinquent
insureds showing the same general information shall be sent to
the insurance agent shown on the premium finance agreement at
the same time notice is given to the insured."  11 N.C. Admin.
Code 13.0317 (emphasis added).

Frances Townsend, a Senior Vice-President at Prime Rate stated in an Affidavit that "[f]or North Carolina agents, it is Prime Rate Premium Finance Corporation, Inc.'s normal course of business to send to the listed agent for each affected insurance policy a list of accounts for which 10 Day Notices of Intent to Cancel have been sent."  Townsend Aff. [ECF No. 36-1] at ¶ 4. Daniel contends that this Affidavit is insufficient to prove compliance with the North Carolina regulation.

The Court finds the circumstances of the instant case similar to those of Cahoon v. Canal Ins. Co., 537 S.E.2d 538 (N.C. Ct. App. 2000), in which the Court of Appeals of North Carolina overruled the trial court's finding that the cancellation of an insurance policy by a premium finance company had been ineffective.  In Cahoon, the court stated:

> Finally, plaintiff argues that the purported cancellation of his policy violates regulations promulgated pursuant to N.C. Gen.Stat. § 58-35-85.  North Carolina Administrative Code title 11, r. 13.0317 requires "ten-day written notice of intent to cancel as described in G.S. § 58-35-85(1)," and requires that a copy of the Notice of Intent to Cancel must be "sent to the insurance agent shown on the premium finance agreement at the same time notice is given to the insured." N.C. Admin. Code tit. 11, r. 13. 0317 (June 1998).  It appears from the record that a copy of the Notice of Intent to Cancel was forwarded to plaintiff's insurance agent.  An affidavit prepared by Barbara Thomas, the Customer Service Manager at Agency Premium Services, Inc., states in pertinent part:

6. That based on her review of her file, a
Notice of Intent to Cancel was mailed on
December 12, 1996 to Carlton Joedy Cahoon to
the last known address of Carlton Joedy
Cahoon shown on the Premium Finance
Agreement; <u>further, that a Notice of the
intent to cancel was also mailed to SIA
Tideland, the insurance agent</u>.

It appears from Ms. Thomas's affidavit that
the Notice of Intent to Cancel was mailed to
SIA Tideland, the insurance agent, and
plaintiff Cahoon, as required by the
regulations. Ms. Thomas's affidavit is
neither impeached nor contradicted by
evidence for plaintiff. This assignment of
error is also overruled.

While we agree with the trial court that
there are no genuine issues of material fact
with regard to the circumstances surrounding
the cancellation of plaintiff's policy, we
hold that Agency complied with the statutory
and regulatory scheme for the cancellation
of plaintiff's insurance policy and that the
trial court erred in entering summary
judgment for plaintiff. Instead, summary
judgment should be entered for defendant
appellants Canal and Agency.

<u>Id.</u> at 542 (emphasis in original).  The Court agrees with the

reasoning of the <u>Cahoon</u> court and concludes that the

cancellation of the National Casualty policy complied with the

North Carolina statutory and regulatory requirements, and,

therefore, that the policy was not in effect on October 26,

2007.[5]

---

[5]    Daniel also contends that the cancellation was ineffective
because it did not comply with the procedures set forth in the
Federal Motor Carrier Safety Regulations for interstate motor

1.   The Driver Group Members Were Not Northland
     Insureds

Even if the National Casualty policy were in effect on

October 26, 2007, National Casualty is entitled to summary

judgment because the Driver Group members were not "insureds"

---

carriers.  See [ECF No. 63-1] at 17-20.  However, despite
Daniel's arguments to the contrary, R&H did not have an
interstate motor policy, and, therefore, the federal regulations
do not apply to cancellation of the National Casualty policy.
See, e.g., Waters v. Miller, 560 F. Supp. 2d 1318, 1324-25 (M.D.
Ga. 2008) ("In this case, the essence of Plaintiff's argument is
that because Progressive knew or should have known that Miller
required interstate coverage, the burden of ensuring compliance
with the federal regulations should be shifted to Progressive.
The Court finds Plaintiff's argument unavailing. The only record
evidence that could reasonably support the conclusion that
Progressive knew or should have known that Miller was driving
the tractor-trailer out of state is the 300-mile radius term
contained in the Policy. . . . [T]he mere possibility that
Miller may have traveled out of state at some point after the
inception of the Policy is insufficient to warrant the type of
burden-shifting that Plaintiff urges. . . . The Court therefore
declines to rewrite the parties' agreement to include the MCS-90
endorsement. For these reasons, Progressive is entitled to
summary judgment on Plaintiff's claims."); Howard v. Quality
Xpress, Inc., 989 P.2d 896, 899 (N.M. Ct. App. 1999) ("While we
agree that it appears from the record that Quality was engaged
in interstate commerce requiring it to have complied with DOT
regulations, nothing in the record indicates that Guaranty, as
an insurer, had any basis to believe that the insurance contract
needed to so comply.  Guaranty complied with state law, but
Quality did not inform Guaranty of its interstate travels.
Precisely the opposite, Quality chose to answer 'no' and leave
blank the questions regarding interstate travel and filings
required.  Quality only requested intrastate coverage. . . .
[T]he regulatory scheme appears to place the burden of
compliance with the compulsory insurance coverage requirements
upon the motor carrier, not the insurer. . . . As the insured,
Quality had knowledge of the information that was relevant to
Guaranty's assumption of the insurance risk and had an
obligation to provide the requested pertinent information.").

under the Northland policy.

"An insurer is not entitled to indemnification or contribution from another insurer for payment of a liability claim unless both insurers insure the same interests." Great Plains Mut. Ins. Co. v. Nw. Nat. Cas. Co., 914 F. Supp. 459, 464 (D. Kan. 1996); see also Vance Trucking Co. v. Canal Ins. Co., 395 F.2d 391, 396 (4th Cir. 1968) ("The requirement for contribution is that the insurers must have insured the same risk and interest, or, as it has been stated, there must exist a common liability upon the same obligation."); Hartford Acc. & Indem. Co. v. Scarlett Harbor Associates Ltd. P'ship, 674 A.2d 106, 134 (Md. Ct. Spec. App. 1996) ("[T]he right to indemnity is premised on the obligations between the wrongdoers, who 'must have had some sort of relationship' justifying indemnity. Indemnity has also been described as 'a right which inures to a person who has discharged a duty which is owed by him but which, as between himself and another, should have been discharged by another.'" (internal citation omitted)).

As pertinent hereto, there are five possible definitions of an "insured" under the Northland policy.  [ECF No. 46-2] at 6. The Driver Group members do not qualify as an "insured" under any such definition.

a.   Section II.A.1.a

Section II.A.1.a of the Northland policy states that "you
[are an "insured"] for any covered 'auto'." [ECF No. 46-2] at
6.  Covered "autos" under the Northland policy include, inter
alia: "Only those 'autos' you lease, hire, rent or borrow."
[ECF No. 46-2] at 2, 4.[6]  The 1997 Freightliner and the Ryder
trailer were, therefore, covered "autos" under the Northland
policy.  The Northland policy also states: "Throughout this
policy the words 'you' and 'your' refer to the Named Insured
shown in the Declarations." [ECF No. 46-2] at 4.  The Named
Insured on the Northland policy in effect from 05/01/2007 to
05/01/2008 was BDH, the predecessor to H&F.[7]

Daniel contends that "at the time of the accident, R&H was
leased to H&F and was therefore acting as H&F, not R&H (making
section a. apply)." [ECF No. 66-1] at 9.  However, Daniel
provides no legal support for her argument that the policy
should be read to include additional parties under the term
"Named Insured."

Moreover, H&F did not, as Daniel contends, concede in the
underlying lawsuit that Driver Group members were operating

---

[6]    The 1997 Freightliner was leased from R&H, and the Ryder
trailer was leased from Hotchkiss.  SAC ¶ 11.

[7]    H&F is listed as the insured on General Change Endorsements
to the Northland policy dated 04/08/2008 and later.  See, e.g.,
[ECF No. 47-3] at 18.

under the authority of H&F.  Rather, counsel for H&F stated in a

Declaration submitted to the Court that:

> [A]s the case progressed, various documents
> were produced and testimony elicited that
> revealed, . . . [that] the legal effect of
> the documents and testimony could result in
> a finding that [the Driver Group] operated
> under the authority of H&F and/or H&F was
> otherwise responsible for [the Driver
> Group's] conduct.
>
> In light of the analysis above, extent of
> injuries, and other reasons, Northland
> entered into a settlement . . . for, inter
> alia, the Northland policy limits.

Garber Dec. [ECF No. 54-5] at ¶¶ 6-7 (emphasis added).

Daniel also contends that the Driver Group members were

insured under the Northland policy because "Derrick Hines was,

an employee of H&F, not R&H, pursuant to the MCS-90 and 49

C.F.R. §390.5.  This is because . . . North Carolina . . .

incorporates the Federal Motor Carrier Safety Regulations,

specifically . . . the definition of 'employee(s)' contained in

49 C.F.R. 390.5."  [ECF No. 46-2] at 9.  The Northland policy

contains an MCS-90 endorsement.[8]  However, "federal courts have

---

[8]    See Forkwar v. Progressive N. Ins. Co., 910 F. Supp. 2d
815, 824-25 (D. Md. 2012) ("Congress enacted the Motor Carrier
Act of 1980 (MCA), 'in part, to address abuses that had arisen
in the interstate trucking industry which threatened public
safety, including the use by motor carriers of leased or
borrowed vehicles to avoid financial responsibility for
accidents that occurred while goods were being transported in
interstate commerce.' Canal Ins. Co. v. Distrib. Servs., Inc.,
320 F.3d 488, 489 (4th Cir.2003).  In furtherance of this
purpose, the MCA requires all motor carriers registered to

been virtually unanimous in holding that the MCS-90 endorsement

provides coverage only to the named insured." <u>Forkwar v.

Progressive N. Ins. Co.</u>, 910 F. Supp. 2d 815, 826 (D. Md. 2012).

The Driver Group members are not Named Insureds, and,

therefore, are not covered under II.A.1.a of the Northland

policy.

### b.  <u>Section II.A.1.b</u>

Section II.A.1.b(1) of the Northland Policy provides that

"insureds" include:

> Anyone using a covered "auto" you own, hire
> or borrow <u>except the owner, or any
> "employee," agent or driver of the owner</u>, or
> anyone else from whom you hire or borrow a
> covered "auto". (emphasis added).

H&F leased the 1997 Freightliner from R&H.  <u>See</u> SAC ¶ 11

("Derrick Hines was operating the truck tractor leased by Aaron

---

engage in interstate commerce to file 'a bond, insurance policy,
or other type of security' in an amount determined by the
Secretary of Transportation and the laws of the State of States
in which the carrier intends to operate.  49 U.S.C. §
13906(a)(1).  Pursuant to his authority under the MCA, <u>see</u> <u>id.</u> §
13906(f), the Secretary has issued regulations requiring that
every liability insurance policy covering a motor carrier
contain an MCS-90 endorsement. 49 C.F.R. §§ 387.7, 387.9,
387.15. . . . 'It is well established that the primary purpose
of the MCS-90 endorsement is to assure that injured members of
the public are able to obtain judgment from negligent authorized
interstate carriers.' <u>Canal Ins. Co.</u>, 320 F.3d at 490 (quoting
<u>John Deere Ins. Co. v. Nueva</u>, 229 F.3d 853, 857 (9th Cir.2000))
(alterations omitted).  'Accordingly, the MCS-90 endorsement
creates a suretyship by the insurer to protect the public when
the insurance policy to which the MCS-90 endorsement is attached
otherwise provides no coverage to the insured.' <u>Canal Ins. Co.</u>,
320 F.3d at 490 (citations omitted).").

Hines and R&H Trucking, Inc. and thereafter leased to H&F.").
As the owner of the 1997 Freightliner, R&H is excluded as an
"insured" by the plain language of Section II.A.1.b(1).
Similarly, because Aaron Hines was the owner and Derrick Hines
was an employee of R&H, they fall into Section II.A.1.b(1)'s
exception for employees of the owner of the covered "auto" and
are not considered an "insured."  Therefore, none of the Driver
Group members is an "insured" under H&F's Northland policy.

c.    Section II.A.1.c

Section II.A.1.c of the Northland Policy provides that
"insureds" include:

> The owner or anyone else from whom you hire
> or borrow a covered "auto" that is a
> "trailer" while the "trailer" is connected
> to another covered "auto" that is a power
> unit.

H&F leased the Ryder trailer from Hotchkiss.  See SAC ¶ 11
("The trailer attached to the truck tractor being operated by
Derrick Hines was leased and provided by Hotchkiss Trucking,
Inc. to H&F, Derrick Hines, Aaron Hines, and R&H Trucking,
Inc.").  Because none of the Driver Group members is the owner
or lessor of the trailer, none is covered under II.A.1.c of the
Northland policy.

d.    Section II.A.1.d

Section II.A.1.d of the Northland Policy provides that
"insureds" include:

> The lessor of a covered "auto" that is not a
> "trailer" or any "employee," agent or driver
> of the lessor while the "auto" is leased to
> you under a written agreement if the written
> agreement between the lessor and you does
> not require the lessor to hold you harmless
> and then only when the leased "auto" is used
> in your business as a "motor carrier" for
> hire.

R&H was the lessor of the 1997 Freightliner to H&F.  See SAC ¶ 11.  The executed lease agreement between R&H and H&F did contain a "hold harmless" clause, stating that "CONTRACTOR [the Driver Group] agrees to . . . hold CARRIER [H&F] harmless." [ECF No. 54-8] at 42.  However, as discussed in more detail herein, that clause is found under a provision for bobtail liability,[9] which is different from liability imposed when a motor carrier is in use for trucking.[10]  Derrick Hines was not bobtailing at the time of the October 26, 2007 accident, so this provision is inapplicable.  Therefore, the Driver Group members are not covered under II.A.1.d of the Northland policy.

### e.   Section II.A.1.e

Section II.A.1.e of the Northland Policy provides that "insureds" include:

> Anyone liable for the conduct of an
> "insured" described above but only to the

---

[9]    See infra Part IV.B.2.a.

[10]    Bobtailing means "the operation of a tractor without an attached trailer."  Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co., 699 A.2d 482, 488 n.2 (Md. Ct. Spec. App. 1997).

extent of that liability.

Plaintiff has provided no evidence that any Driver Group member is "liable for the conduct of an 'insured'" and so the Court finds that this section does not apply to the Driver Group members. For the reasons discussed supra, the Driver Group member are not themselves "insureds" under any of the pertinent definitions. Therefore, no Driver Group Member is covered, either directly or indirectly, under II.A.1.e of the Northland policy.[11]

---

[11]   Daniel contends that the Driver Group members were insured under the Northland policy "because H&F was liable for their actions under . . . Wisconsin insurance law" and "Wisconsin has a comprehensive statute requiring certain coverages in 'every policy of insurance issued or delivered in [the] state against the insured's liability for loss or damage resulting from accident caused by any motor vehicle, whether the loss or damage is to property or to a person.'" [ECF No. 67] at 2, 5-6 (alteration in original).

Judge Young of this Court stated in Rouse Co. v. Fed. Ins. Co., 991 F. Supp. 460 (D. Md. 1998):

> Initially, the Court must determine what law applies under Maryland's choice of law rules, which this Court must follow when exercising diversity jurisdiction. The absence of a forum selection clause in the policy requires the Court to follow Maryland's general rule of lex loci contractus by looking to the law of the place where the contract was made to determine its meaning and operation. Under the lex loci principle, a contract is "made" where the last act necessary for its formation is performed. In the context of insurance contracts, the "last act" necessary to form the contract is usually the delivery of the policy and the payment

>         2.    National Casualty Policy was Excess to Northland
>               Policy

Finally, even if the National Casualty policy had been in effect on October 26, 2007 and the Driver Group members had been insureds under the Northland policy, National Casualty is entitled to summary judgment because coverage under the National Casualty policy was excess to coverage under the Northland policy.

>         a.    National Casualty Policy – V.B.5

The National Casualty policy states, as pertinent hereto:

> a.    This Coverage form's Liability Coverage
> is primary for any covered "auto" while
> hired or borrowed by you and used
> exclusively in your business as a
> "trucker" and pursuant to operating
> rights granted to you by a public

---

> of premiums, which undisputedly occurred in
> Maryland.    However, if the insurance
> contract requires the countersignature of a
> representative of the insurance company to
> render the contract effective, the
> countersignature is the last act needed to
> form the contract.

Id. at 462-63 (citations omitted).

Daniel contends that Wisconsin law applies to the interpretation of the Northland policy because the last act necessary to form the contract – delivery of the policy to H&F and payment of the premium – occurred in Wisconsin.  Id. at 5-6. However, there is a countersignature on the front page of the Northland policy on behalf of an organization with a mailing address in Minnesota.  Thus, Daniel would not be entitled to summary judgment on the issue of the application of Wisconsin law because there may be a fact issue as to where the last act necessary to form the contract occurred.

Moreover, as discussed herein, National Casualty is entitled to summary judgment because Northland did not suffer any damages, the National Casualty policy was cancelled, and/or the National Casualty policy was excess to the Northland policy.

> authority.  <u>This Coverage form's
> Liability Coverage is excess over any
> other collectible insurance for any
> covered "auto" while hired or borrowed
> from you by another "trucker"</u>. However,
> while a covered "auto" which is a
> "trailer" is connected to a power unit,
> this Coverage form's Liability Coverage
> is:
>
> (1) on the same basis, primary or
>     excess, as for the power unit if the
>     power unit is a covered "auto."
>
> (2) Excess if the power unit is not a
>     covered "auto".

[ECF No. 10-8] at 30 (emphasis added).  A covered "auto" is

"[o]nly those 'autos' described in Item Three of the

Declarations for which a premium charge is shown (and for

Liability Coverage any 'trailers' you don't own while attached

to any power unit described in Item Three)."  [ECF No. 10-8] at

5, 20.  The 1997 Freightliner and Ryder trailer are covered

"autos" under the National Casualty policy; the tractor was

leased from R&H, and the trailer was attached to the tractor, a

covered "auto."  Therefore, under Section V.B.5.a, the National

Casualty policy was excess over the Northland policy.

Daniel, seeks to rely on Section V.B.5.e to contend that

the National Casualty policy was primary.  Section V.B.5.e

states:

> e. Regardless of the provisions to paragraphs a,
>    b and c. above, this Coverage form's
>    Liability Coverage is primary for any
>    liability assumed under an "insured
>    contract."

[ECF 10-8] at 30.  An "insured contract" is defined as "[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another to pay for 'bodily injury' or 'property damage' to a third party or organization."  [ECF No. 10-8] at 32.

Daniel contends that "R&H and Derrick Hines were leased on to H&F under a written agreement [that] required R&H, Aaron Hines and Derrick Hines to assume any liability incurred by H&F in performance of the contract."  [ECF No. 67] at 10.  Daniel cites to a provision of a "Motor Vehicle Lease Agreement" that states "CONTRACTOR [the Driver Group] agrees to assume, pay, identify and hold CARRIER [H&F] harmless from any loss or damage caused by the negligent operation . . . of the equipment leased hereunder."  [ECF No. 54-8] at 42.

The parties have provided the Court with a copy of the Motor Vehicle Lease Agreement, but there is no evidence that R&H and/or H&F ever signed the agreement.  Counsel for H&F in the underlying lawsuit informed the Court in a Declaration that "the Hines Defendants never completed the paperwork to be leased on to H&F."  Garber Dec. [ECF No. 54-5] at ¶ 6.  Counsel for Daniel informed National Casualty, "I do not have a contract.  Mr. Hotchkiss [of H&F] testified the contract was not signed.  He also testified that if it was signed, it was burned by him

. . . . Mr. Hines testified he signed the contract and sent it
back without making a copy." [ECF No. 47-4].

Moreover, the "hold harmless" provision falls under a
section of the agreement titled "Bobtail Liability and
Insurance."  "Bobtailing refers to the operation of a tractor
without an attached trailer."[12] Empire Fire & Marine Ins. Co. v.
Liberty Mut. Ins. Co., 699 A.2d 482, 488 n.2 (Md. Ct. Spec. App.
1997).  A "'bobtail,' insurance policy is[, therefore,] intended
to cover the insured when the vehicle is not being operating in
the business of an [Interstate Commerce Commission] carrier-
lessee."  Id. at 489.  The accident at issue occurred when
Derrick Hines was operating the 1997 Freightliner with the Ryder
trailer attached.  Therefore, any bobtail liability insurance
provisions are inapplicable to insurance coverage related to the
October 26, 2007 accident.

Accordingly, the Court finds that the National Casualty
policy was excess to any other collectible insurance.

b.   Northland Policy – V.B.5

The Northland policy states, as pertinent hereto:

b.   While any covered "auto" is hired or borrowed by
     you from another "motor carrier," this Coverage
     form's liability coverage is:

---

[12]   Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co., 699
A.2d 482, 488 n.2 (Md. Ct. Spec. App. 1997).  "For the
uninitiated, 'bobtailing' should not be confused with
'deadheading' which refers to the operation of a tractor-trailer
when the trailer is empty."  Id.

>           (1) Primary if a written agreement between the
>               other "motor carrier" as the lessor and you as
>               the lessee does not require the lessor to hold
>               you harmless, and then only while the covered
>               "auto" is used exclusively in your business as
>               a "motor carrier" for hire.
>           (2) Excess over any other collectible insurance if
>               a written agreement between the other "motor
>               carrier" as the lessor and you as the lessee
>               requires the lessor to hold you harmless.
>       c.  While a covered "auto" which is a "trailer" is
>           connected to a power unit, this Coverage form's
>           Liability Coverage is:
>           (1) Provided on the same basis, either primary or
>               excess, as the liability coverage provided for
>               the power unit if the power unit is a covered
>               "auto."
>           (2) Excess if the power unit is not a covered
>               "auto."
>       . . . .
>       e.  Except as provided in Paragraphs a., b., c., and d.
>           above, this Coverage form provides primary
>           insurance for any covered auto you own and
>            excess insurance for any covered auto you do not
>           own.

[ECF No. 46-2] at 14.

Daniel contends that the Northland policy was excess on the grounds that "[t]he tractor operated by Derrick Hines was leased to H&F Bros. by written agreement at the time of the occurrence, and the agreement contains a hold harmless provision." [ECF No. 66-1] at 12. Alternatively, Daniel contends that the Northland policy was excess, pursuant to Section V.B.5.b.e, because Northland did not own the 1997 Freightliner.

For the reasons discussed supra, the Court finds that the

Motor Vehicle Lease Agreement[13] did not require R&H to hold H&F harmless.  In fact, the agreement states that "[d]uring the time of this agreement, <u>CARRIER [H&F] assumes liability for bodily injuries to or the death of any person</u>."  [ECF No. 54-8] at 32 (emphasis added).  And, at the time of the accident, the 1997 Freightliner and Ryder trailer were being used exclusively to transport a shipment of goods for H&F.

Accordingly, the Court finds that the Northland policy was primary to any other collectible insurance.


IV.   <u>CONCLUSION</u>

For the foregoing reasons:

1.   Defendant National Casualty Company's Renewed Motion for Summary Judgment [ECF No. 62] is GRANTED.

2.   Plaintiff's Second Cross-Motion for Summary Judgment or in the Alternative, Motion for Partial Summary Judgment [ECF No. 63] is DENIED.

3.   Judgment shall be entered by separate Order.


SO ORDERED, on <u>Wednesday, September 23, 2015</u>.


_____/s/_____
Marvin J. Garbis
United States District Judge

---

[13]   Assuming it was a valid written agreement.